Citation Nr: 1302154 
Decision Date: 01/18/13 Archive Date: 01/23/13

DOCKET NO. 98-11 831 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Atlanta, Georgia


THE ISSUE

Whether the Veteran's death was the result of willful misconduct.


REPRESENTATION

Appellant represented by: Georgia Department of Veterans Services


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

K. J. Kunz, Counsel


INTRODUCTION

The Veteran served on active duty from November 1984 to June 1996. The exact dates of his service have not been verified. His service ended with his death in a motor vehicle accident (MVA). The appellant is the custodian and mother of the Veteran's daughter, who was a minor when the Veteran died and when the appellant filed a claim for survivor's benefits for the daughter.

Originally, the appellant's claim was on appeal from a February 1997 decision of the United States Department of Veterans Affairs (VA) Regional Office (RO) in Atlanta, Georgia. In that decision, the RO denied dependency and indemnity compensation (DIC) for the daughter because the RO found that the death of the Veteran was not incurred in the line of duty, but was the result of the Veteran's own willful misconduct.

In January 2005, the appellant had a Travel Board hearing before the undersigned Veterans Law Judge. The transcript of the hearing is in the claims file. In March 2005, the Board remanded the case to the RO for the development of additional evidence. In a March 2007 decision, the Board found that the Veteran's death was the result of his own willful misconduct, and therefore denied DIC for the daughter. The appellant appealed that decision to the United States Court of Appeals for Veterans Claims (Court).

In December 2008, the Court granted a joint motion for remand (JMR) from the parties (the appellant and VA) to vacate the March 2007 Board decision and remand the appeal to the Board for action as directed.

In August 2009, the Board remanded the case to the RO via the VA Appeals Management Center (AMC) to provide the appellant additional notice and readjudicate the issue on appeal. The remand instructions were fulfilled, and the case was returned to the Board.

In a November 2010 decision, the Board found that the Veteran's death was the result of his own willful misconduct, and therefore denied DIC for the daughter. The appellant appealed that decision to the Court.

In June 2012, the Court granted a JMR from the parties to vacate the November 2010 Board decision and remand the appeal to the Board for action as directed.

To ensure a total review of the evidence, the Board reviewed the physical claims file and also checked the Virtual VA electronic file system for any evidence on the case in that system. At present, there are no documents regarding this case in the Virtual VA electronic file system.


FINDINGS OF FACT

1. The Veteran died on June [redacted], 1996, from injuries sustained in a motor vehicle accident.

2. The Veteran drove the car on June [redacted], 1996, at excessive speeds, after consuming alcoholic beverages, after a heated argument with his wife, who was a passenger in the car, and without wearing a seatbelt.

3. The Veteran's driving the car despite knowledge of the circumstances, and the manner in which the Veteran drove under those circumstances, was intentional wrongdoing performed with knowledge of or wanton and reckless disregard of the probable consequences.


CONCLUSION OF LAW

The Veteran's death was the result of his own willful misconduct, so was not incurred in the line of duty, and the cause of his death is not service connected. 38 U.S.C.A. §§ 105, 1110, 5107 (West 2012); 38 C.F.R. §§ 3.1(m), (n), 3.301 (2012).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, and 5126 (West 2002 & Supp. 2011)) redefined VA's duty to assist a claimant in the development of a claim for VA benefits. VA regulations for the implementation of the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a) (2012).

The notice requirements of the VCAA require VA to notify a claimant of what information or evidence is necessary to substantiate the claim; what subset of the necessary information or evidence, if any, the claimant is to provide; and what subset of the necessary information or evidence, if any, VA will attempt to obtain. 38 C.F.R. § 3.159(b). With regard to service connection claims, the Court has stated that the requirements apply to all five elements of a service connection claim: veteran status, existence of a disability, a connection between the veteran's service and the disability, degree of disability, and effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). VCAA notice must be provided to a claimant before the initial unfavorable decision on a claim for VA benefits by the agency of original jurisdiction (in this case, the RO). Id.; see also Pelegrini v. Principi, 18 Vet. App. 112 (2004). Insufficiency in the timing or content of VCAA notice is harmless, however, if the errors are not prejudicial to the claimant. Conway v. Principi, 353 F.3d 1369, 1374 (Fed. Cir. 2004) (VCAA notice errors are reviewed under a prejudicial error rule).

In this case, in February 1997, when the RO denied service connection for the cause of the Veteran's death and denied DIC for the Veteran's daughter, the RO provided some information about when DIC may be paid to a Veteran's dependents. In a January 2002 letter, the RO provided the appellant information about VA's definition of willful misconduct. In a July 2004 letter, the RO provided the appellant information about what evidence was needed, what evidence VA would seek, and the appellant's responsibility regarding obtaining needed evidence. 

The JMR that the Court granted in December 2008 indicated that VA had not provided the appellant sufficient notice about the concept of willful misconduct and that a finding of willful misconduct operates to make a death not service connected. In the Board's August 2009 remand, the Board instructed the AMC or RO to provide the appellant notice consistent with the JMR, relevant to a claim for service connection for the cause of a veteran's death, and tailored to the circumstances of the appellant's case. The Board instructed the AMC or RO to readjudicate the case after providing the required notice. In a October 2009 letter, an RO provided the appellant additional notice included the VA regulatory definitions relevant to the issues in the appellant's case. That letter also informed the appellant how VA assigns effective dates. The letter informed the appellant what evidence she needed to supply, and what evidence VA is responsible for getting. In a May 2010 supplemental statement of the case, the RO readjudicated the issue of whether the Veteran's death was the result of willful misconduct.

The claims file contains considerable evidence about the MVA in which the Veteran died and the circumstances surrounding that MVA, as well as additional evidence about the Veteran. This evidence includes the Veteran's service records, investigative reports, and autopsy and psychological autopsy reports. The file contains statements from the appellant and other parties with knowledge about the Veteran and the MVA, and contains the transcript of the 2005 Travel Board hearing. The file contains the evidence that the Board sought on remand, and an RO provided notice that fulfilled the Court's and Board's remand instructions. On review of the file, the Board is satisfied that there has been substantial compliance with the Board's and the Court's remand directives, such that the Board may proceed with review of the case. See Stegall v. West, 11 Vet. App. 268 (1998). 

The Board finds that the appellant was notified and aware of the evidence needed to substantiate the case, as well as the avenues through which she might obtain such evidence, and the allocation of responsibilities between the appellant and VA in obtaining such evidence. The appellant has actively participated in the claims process by providing evidence and argument. Thus, she was provided with a meaningful opportunity to participate in the claims process, and she has done so. At no time during this appeal - or as part of any CAVC appeal - did the appellant reference any outstanding evidence that she believed was relevant to her claim. In October 2012, following the most recent CAVC remand, in response to the Board's letter providing her time to submit additional evidence or argument, she replied that she had nothing further to submit. She provided the same response in May 2010 following the first CAVC appeal. In fact, even following the 2009 notice of how VA determines willful misconduct, she has not submitted one piece of evidence. Therefore, the Board is satisfied VA has obtained whatever evidence exists that is relevant.

Any error in the sequence of events or content of the notice is not shown to have affected the essential fairness of the adjudication nor to have caused injury to the appellant's case or the interests of the Veteran's daughter. See Pelegrini, 18 Vet. App. at 121. Therefore, any such error is harmless, and does not prohibit consideration of the claim on the merits. See Conway, 353 F.3d at 1374, Dingess, 19 Vet. App. 473; see also ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998).

Whether the Veteran's Death was the Result of Willful Misconduct

The Veteran died in an MVA in June 1996 while he was on active duty. The appellant is seeking DIC for the Veteran's daughter. The appellant essentially contends that the Veteran's death was not caused by willful misconduct.

When a veteran dies from service-connected disability, or dies while in active military service, VA pays DIC to the veteran's surviving spouse, children, and parents. 38 U.S.C.A. § 1310 (West 2002). For disability resulting from personal injury suffered in line of duty, VA pays disability compensation, but no compensation shall be paid if the disability is a result of the person's own willful misconduct or abuse of alcohol or drugs. 38 U.S.C.A. § 1110.

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Abernathy v. Principi, 3 Vet. App. 461, 465 (1992); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990).

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a claim, VA shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107.

Where a veteran's death occurs while on active duty, the death is presumed to have occurred in the line of duty. 38 U.S.C.A. § 105. Direct service connection, however, may be granted only when a disability or cause of death was incurred or aggravated in line of duty, and was not the result of the veteran's own willful misconduct or, for claims filed after October 31, 1990, the result of his abuse of alcohol or drugs. 38 C.F.R. § 3.301.

In short, the line of duty presumption is rebuttable where the "preponderance of the evidence" indicates that the veteran's death was due to his own willful misconduct. Thomas v. Nicholson, 423 F.3d 1279 (Fed. Cir. 2005). In fact, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that a finding of willful misconduct precludes a finding of service connection for the purposes of DIC entitlement under 38 U.S.C.A. § 1310. See Myore v. Nicholson, 489 F.3d 1207, 1212 (2007). 

"Willful misconduct" means an act involving conscious wrongdoing or known prohibited action. (1) It involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences. (2) Mere technical violation of police regulations or ordinances will not per se constitute willful misconduct. (3) Willful misconduct will not be determinative unless it is the proximate cause of injury, disease, or death. 38 C.F.R. § 3.1(n).

The assembled evidence provides considerable information about events preceding and at the time of the MVA in which the Veteran died. Some of the evidence is indirect, and some questions cannot be fully answered, because both persons present at the MVA, the Veteran and his wife, died in the MVA. With respect to matters that affect the essential questions in this case, the Board will analyze what significant parts of the evidence show or fail to show, how persuasive those parts of the evidence are, and why.

The Veteran was on active duty in June 1996 when the MVA occurred. Military police agents (CID) investigated the MVA beginning within one or two hours after it occurred. A CID agent completed a report of the accident investigation in October 1996. 

Reports from soon after the MVA indicate that it occurred between 2:30 and 4:00 am on June [redacted], 1996. Information about events preceding the accident comes from statements under oath from a son of the Veteran's wife, and the girlfriend of that son. Those two witnesses were interviewed by military police on June [redacted], 1996, within a few hours after the accident. The girlfriend stated that after midnight on June [redacted], 1996, she went with the son to an apartment complex, and there they met the Veteran's wife. The wife had gone to the apartment complex because she believed that the Veteran was there with a woman with whom she believed he was having an extramarital affair. The Veteran and the woman came out of the apartment in response to knocking on the door. The Veteran's wife confronted the Veteran and was hitting him. There was some fighting between the Veteran and his wife's son. The Veteran got into his wife's car to drive away. His wife managed to get into the back seat of the car. The Veteran and his wife drove away, and the son and son's girlfriend followed in another car. The Veteran and his wife stopped at their residence, but did not get out of the car, and drove off again. The son and girlfriend tried to follow but the Veteran increased his speed, and the son was not able to keep up because of the speed the Veteran was driving. The son said that he drove as fast as 85 miles per hour (mph), and believed that the Veteran was driving as fast as 100 mph. After a few minutes the son and girlfriend came upon the scene of the accident. They found the car and saw the Veteran's wife inside, but indicated that there was no light. They drove to a place where they could call police. In response to a police interview question, the son stated that he did not know whether the Veteran was drinking alcohol before the accident.

A military police patrolman who responded to the scene of the accident completed a traffic accident investigation report. The car was totally smashed in, and was against a large tree. The Veteran was not wearing his seatbelt and was found ejected from the car, about ten feet away from it. The Veteran's wife was wearing her seatbelt. Emergency medical responders pronounced both persons dead at the scene of the accident. The investigator detected a strong odor of alcohol emitting from the Veteran. An empty beer can was found outside of the car. The investigator concluded that the car the Veteran was driving on a state highway was going at a high rate of speed and failed to negotiate a curve. The tires left a set of yaw marks on the road indicating lack of traction and side slipping. The investigator concluded that the car then crossed the center line and went off the road. The investigator concluded that the car then struck several small trees and then hit and stopped against the large tree. The investigator performed calculations based on the yaw marks and the shape of the curve in the road, and concluded that the car was travelling a minimum of 81 miles per hour on the roadway (the speed limit was 55 mph). It was noted that the evidence did not indicate that the Veteran had applied the brakes, but that there was evidence that the Veteran initiated corrective action to steer his car back onto the road, but overcompensated in his reaction, and the car then skidded off the road on the other side. The CID report indicated that the road was dry and clear and the weather was warm at the time of the accident.

The Veteran's body was examined at an Army hospital within an hour after the accident. An examination report indicated that the results of blood alcohol testing were pending. The examiner checked boxes registering opinions that the Veteran was not under the influence of alcohol or drugs, that the Veteran was mentally sound, and that the injury was incurred in the line of duty. 

On June [redacted], 1996, a military trial counsel, on review of information gathered by CID, opined that there was probable cause to believe that the Veteran committed the offense of negligent homicide.

On the report of the June [redacted], 1996 medical examination report, a box is checked indicating that a formal line of duty investigation was required. 

A military forensic toxicologist tested specimens from the Veteran. The testing showed blood alcohol content of .063 percent and urine alcohol content of .088 percent. 

In a July 3, 1996, memorandum, an Army unit commander appointed another officer to investigate the death of the Veteran and complete a formal line of duty investigation.

In September 1996, the military officer investigating the accident for purposes of making a line of duty determination indicated that no determination was made with regard to whether the accident and death occurred in the line of duty.

In October 1996, a military psychologist provided a psychological autopsy report. The psychologist reported having reviewed the Veteran's personnel record, interviews conducted by CID, and reports assembled by CID, and having interviewed a neighbor of the Veteran. The psychologist found that personnel records showed that the Veteran had a good record and was successful in his military career. He had served a tour in Saudi Arabia ending in 1991. The psychologist noted that coworker interviews gave no indication that the Veteran had any serious problems. Friends indicated that the Veteran might drink one or two beers in a night, but stated that they had never seen him drunk. They denied that he used drugs. A coworker who was at the Veteran's house on June 10, 1996, denied any tension in the house. The psychologist noted that before the accident the Veteran and his wife argued about his apparent extramarital affair and raised the issue of divorce. The confrontation included the wife hitting the Veteran. The couple then argued about which of them would drive the car, which was owned by the wife. No surviving witness heard what was said in the car after the Veteran drove off. The wife's son could not keep up with following the car the Veteran was driving because the Veteran was driving so fast. The psychologist noted the police report estimate of the car's speed at 81 mph, the toxicology reports regarding blood and urine alcohol content, and the one beer can found at the scene. The psychologist noted that the blood alcohol content was lower than the state of Georgia's limit for constituting intoxication. "Alcohol does not appear to be an issue in the accident," the psychologist wrote, "but the heated emotions and potential for arguing in the car seem to be likely contributors to [the Veteran's] lack of concentration to his driving." The psychologist noted that before the Veteran and his wife drove off witnesses saw them engage in heated argument. The psychologist suggested that while driving the Veteran might have turned around to talk to his wife, or he may have just lost control of the car on the curve while travelling at such a high rate of speed. The psychologist stated that the Veteran's military record suggested that he could handle stress while maintaining responsibilities, and indicated that he would not use suicide as an option for dealing with stress. The psychologist stated that the deaths of both the Veteran and his wife made it difficult to speculate on what really happened in the hours leading up to the MVA. The psychologist noted CID forensic evidence that the Veteran did not apply the brakes, but did try to correct a driving error. The psychologist provided the opinion that the Veteran's death was accidental due to excessive speed, and was not due to suicide.

In an October 1996 memorandum, CID found that there was probable cause to believe that the Veteran committed the offense of negligent homicide when he lost control of his car, resulting in the deaths of himself and his wife. The CID report noted the speed of the car, and found that the forensic evidence showed that the Veteran was under the influence of alcohol at the time. The commander noted that the Veteran was dead, and determined that no action would be taken on the charges.

In the January 2005 Travel Board hearing, the appellant, through her representative, argued that the evidence showed that, while there was alcohol involved in the accident, the Veteran was not intoxicated at the time. She asserted that the blood alcohol levels shown by the toxicology report were below those defined as intoxication. She noted that it was possible that speed contributed to the accident, but stated that it was possible that the Veteran was distracted by arguing with his wife, or that the wife grabbed the steering wheel and caused the vehicle to leave the road. The appellant noted that the evidence indicated that the Veteran and his wife had been in a heated argument about marital infidelity. The appellant pointed out that the death of both persons in the car meant that it was not possible to know conclusively what caused the accident. The appellant contended that the available evidence was not sufficient to show that the Veteran engaged in willful misconduct in the events that resulted in the fatal accident. 

The June 2012 JMR contains a notation of a U. S. Army policy to not complete a line of duty finding in death cases.

Immediately following the MVA, a medical examiner checked a box indicating that the Veteran's injury was in the line of duty. Soon thereafter, however, an investigator was appointed to complete a formal line of duty investigation. That investigator submitted in September 1996 a report indicating that no determination was made regarding line of duty. Thus, it appears that military officials intended to investigate and gather thorough evidence regarding the accident, but that the Army ultimately did not make a final determination as to whether the Veteran's death was in the line of duty.

Regardless of whether the Army determined whether the death was in the line of duty, the Veteran's death is not service connected if it was the result of his own willful misconduct. VA's Adjudication Procedure Manual indicates that, in vehicular accidents, VA will consider combined factors such as evidence of excessive speed, improper diversion of attention to companions, or use of intoxicants. M21-1MR, Part III.v.1.D.17.d. These Manual provisions are not binding on the Board, but are informative. The collective investigative evidence indicates that the Veteran's actions and omissions that could be considered misconduct, and that may have contributed to his death, include: (1) driving at excessive speed; (2) driving shortly after consuming alcohol; (3) driving while in an emotionally heated state of mind; and (4) driving without a seatbelt. The evidence indicates that the Veteran did each of these things. The Board will consider, based on the evidence, whether he did them deliberately or at least intentionally, and did them with knowledge of or wanton and reckless disregard of the probable consequences.

There is clear, undisputed, and convincing evidence that the Veteran drove at an excessive speed. A competent investigator measured physical findings at the accident site and concluded that the Veteran was driving the car at least 81 mph when he lost control. The Veteran's stepson reported that he sped up to 85 mph to try to keep the Veteran's car in sight. As he was unable to do so, he concluded that the Veteran drove as fast as 100 mph. While there is no indication that the stepson has expertise to determine the Veteran's exact top speed, his observation of the gap between their cars is strong evidence that at times that night the Veteran drove considerably more than 80 mph. The evidence indicates that there were no weather related hazards, but the stepson's girlfriend credibly stated that it was very dark along the road where the accident occurred. When it was very dark, such that visibility was limited, it was even more hazardous to drive extremely fast. The determination of how fast to drive was under the Veteran's control. His driving as fast as he did was intentional. Driving that fast was dangerous, and it was wrongdoing to put himself and his passenger in danger. An MVA with very forceful impact as a consequence of such driving may not be a certainty, but it is at least reasonably likely and foreseeable. In driving as fast as he did, the Veteran knew or wantonly and recklessly disregarded such a consequence.

The Board concedes that the evidence is inconclusive as to the extent of the role alcohol played in this accident. Under VA regulations, the simple drinking of alcoholic beverage is not of itself willful misconduct. The deliberate drinking of a known poisonous substance or under conditions which would raise a presumption to that effect will be considered willful misconduct. If, in the drinking of a beverage to enjoy its intoxicating effects, intoxication results proximately and immediately in disability or death, the disability or death will be considered the result of the person's willful misconduct. 38 C.F.R. § 3.301(c)(2). 

An injury or disease incurred during active military, naval, or air service shall not be deemed to have been incurred in line of duty if such injury or disease was a result of the abuse of alcohol or drugs by the person on whose service benefits are claimed. For the purpose of this paragraph, alcohol abuse means the use of alcoholic beverages over time, or such excessive use at any one time, sufficient to cause disability to or death of the user. Drug abuse means the use of illegal drugs (including prescription drugs that are illegally or illicitly obtained), the intentional use of prescription or non-prescription drugs for a purpose other than the medically intended use, or the use of substances other than alcohol to enjoy their intoxicating effects. 38 C.F.R. § 3.301(d). 

In this case, the Veteran's blood alcohol content was measured at .063 percent. At that time, Georgia law defined "intoxication" to start at a higher level, .10 percent. Ga. Code Ann., § 40-6-391(a)(5) (1996). Additionally, Georgia law provided that, "any person who drives any vehicle in reckless disregard for the safety of persons or property commits the offense of reckless driving." Ga. Code Ann., § 40-6-390(a) (1996). 

In citing Georgia law, the Board notes that it is not adopting state law in this decision, but rather is considering the local definitions of "intoxication" and "reckless driving" in determining whether the Veteran's actions constituted "willful misconduct." See Yeoman v. West, 140 F.3d 1443 (Fed. Cir. 1998) (considering local law, without "adopting" law contrary to Veteran's law, is not unconstitutionally vague in establishing the criteria that could constitute willful misconduct). 

In the prior Board decisions, it was noted that blood alcohol content percentages lower than .10 did not raise a presumption of intoxication under VA's Adjudication Procedure Manual M21-1, (M21-1), Part IV, Chapter 11, 11.04(c)(2) (using the standards of the National Safety Council, the U.S. Department of Transportation and the Departments of the Army, Navy, and Air Force). Those provisions have now been amended to state that blood alcohol content percentages lower than .08 do not raise a presumption of intoxication. M21-1MR, Part V, 1.D.16 (Willful Misconduct Determinations and Alcohol Consumption). Previously, it was noted that blood alcohol content percentages from .05 to .10 raised considerations of loss of judgment and muscular coordination; now, it is stated that blood alcohol content percentages from .05 to .08 do not raise a presumption that the person was or was not intoxicated or impaired. 

The Board concludes that while it is clear that the Veteran consumed some amount of alcohol prior to driving, it is not possible to find with any degree of certainty that the Veteran was legally intoxicated at the time of the MVA, or that alcohol substantially contributed to the Veteran's death. The Board finds that the evidence does not establish that the Veteran's death was the result of abuse of alcohol. The Board finds the evidence leaves sufficient question about the effect of alcohol on the accident that alcohol use cannot be the sole or a predominant factor in a determination of whether the Veteran's death was due to his own willful misconduct. The Veteran knew he had consumed at least some alcohol, however, and his driving extremely fast when he knew he had consumed some alcohol should be considered together with other factors in evaluating his actions the night of the accident. In other words, there is no presumption here that he was intoxicated or impaired, and the totality of the circumstances surrounding the MVA are more probative evidence.

The statements from the Veteran's stepson and his girlfriend were made soon after the events they described. The Board finds those statements credible. Just before the high speed driving that ended in the MVA, the Veteran was confronted by his wife over perceived marital infidelity. Her response included hitting him, and there was fighting between the Veteran and his stepson. The stepson stated that in the argument between the Veteran and his wife divorce was mentioned. The evidence is convincing that the Veteran's driving at that time occurred while he was in an emotionally heated state of mind.

The accident scene investigation showed that the Veteran was ejected from the car, breaking through car window glass. His wife was found in the car with her seatbelt still fastened. Investigators reasonably and credibly concluded that he was not wearing a seatbelt at the time of the crash. The action of wearing or not wearing a seatbelt is intentional. Commencing driving without wearing a seatbelt is an unwise action, but by itself does not rise to the level of what most would consider wrongdoing. In the context, however, of driving in a car with a person who has just been hitting you, after you have consumed at least some alcohol, and then driving extremely fast, failing to wear a seatbelt certainly is worse conduct than it otherwise would be.

Considering the evidence obtained through investigation, the Board concludes that a combination of the Veteran's actions in the driving that preceded the accident were intentional, as they were in his control, and were wrong, as in combination they put himself, his passenger, and potentially other users of the road, in unreasonable danger. He commenced driving following a emotionally heated argument and scuffle, with a person who was upset enough with him to hit him, knowing that he had consumed at least some alcohol, he did not fasten his seatbelt, and he drove extremely fast in the darkness over a road with at least one curve. Even if no single factor in his driving that night caused the accident, the combination of his actions, each in his control, was wrongdoing with knowledge of or wanton and reckless disregard of the probable consequences.

The appellant argues that the heated argument preceding the Veteran's driving that night might diminish how deliberate or intentional the Veteran's actions in driving were. The Board finds that the Veteran was aware of the emotionally charged situation, just as he was aware that he had consumed at least some alcohol recently, and it was his responsibility to consider those circumstances when he undertook to drive a car. Instead of postponing or refraining from driving, driving cautiously, or even driving in a nonremarkable manner, he drove at extremely hazardous speeds. The Board finds that the effects on him of the dispute with his wife is one of the circumstances the Veteran knew but chose not to take into account, and one of the factors that make his dangerous driving that night more wanton and reckless, not less.

The appellant argued at the Board hearing that with no living witnesses from the car involved in the accident it is not possible to know what happened in the car; that maybe the Veteran's wife grabbed the steering wheel and caused the accident. The Board agrees that it is unknown and unknowable the extent to which the Veteran and his wife were still arguing and otherwise engaging in distracting interaction in the moments before the car went off the road. This certainly does not raise a reasonable doubt, however. A reasonable doubt means that there is an approximate balance of both positive and negative evidence on a particular question. Here, there is no such balance. The suggestion that the Veteran's wife turned the wheel is no better than speculative in the absence of living witnesses. The appellant's allegations are not competent since she was not present. It must also be noted that such an occurrence is not a persuasive interpretation of the evidence from the wife's son that she was in the back seat on the passenger side and the evidence from the accident scene responders that she was found with her seat belt fastened. It is not persuasive that the Veteran's wife could even reach the steering wheel from her location in the car, or that she somehow did so sufficiently to cause an accident and then rebuckled her seat belt. Regardless, this decision is not in any way based on some supposition of what occurred within in the car - it is based on independent and objective factors that were within the Veteran's control, to include, as detailed more below, the speed at which he drove the car and the undeniable fact that he chose to drive a car following an emotional argument with his wife and after consuming at least some alcohol. 

Each of these factors within the Veteran's control are discussed in more detail above and further below, but the Board would like to address the most recent JMR. It was suggested that the Board had failed to adequately explain how these factors led to a conclusion that the Veteran engaged in deliberate or intentional wrongdoing with knowledge or wanton disregard of its probable consequences. It is difficult to ascertain exactly what deficiencies the JMR was identifying. Certainly it cannot be argued that the Veteran did not intentionally make a choice to drive a car. He did - no one forced him to do so. It is hard to fathom how an argument could be made that he did not then choose the manner in which to operate the vehicle, including the speed. There are no indications here of vehicle malfunction or of any weather conditions which could have affected safe operation of a vehicle. So - having made such findings - can we say the Veteran knew he would get in an accident? No, of course not, but that is not what the law requires. Rather, it is that his acts are intentional - and wrong - with wanton disregard for the probable consequences. There is no indication or argument that the Veteran somehow was unaware of how to safely drive a car. It is more than reasonable to conclude that a car driven at an excessive speed (a minimum of 80 mph in a 55 mph speed zone), at night, by a driver who had consumed some alcohol and had just been involved in an emotional argument with his wife would probably lead to an accident. It is not necessary that he intended an accident occur, only that he chose to disregard the probable fact that one would under such circumstances. The Board strenuously disagrees with the implication in the appellant's brief to the CAVC that the evidence needs to show the Veteran intended to injure himself or others. The "probable consequence" here that the Veteran disregarded was that his actions led to the probability (more likely than not) that an accident would occur. The fact that such an accident ultimately killed both him and his wife is certainly unfortunate, but that is not what needs to be shown here to find that his actions amounted to willful misconduct. 

Based on the preponderance of the persuasive evidence, the Board concludes that the manner in which the Veteran operated the car in the minutes preceding and leading to the accident amounted to willful misconduct. The Board finds that the overall evidence of the circumstances leading up to the event are sufficient to rebut the line-of-duty presumption with respect to the Veteran's death. While there are no living witnesses as to whether the Veteran was arguing with his wife while driving, it is clear from the evidence that the Veteran was driving at excessive speed, while in an emotionally charged state, and after having consumed at least some alcohol.

The Veteran chose to operate the car in a dangerous manner despite possible impairment and in emotionally distracting circumstances. That amounted to willful misconduct because his actions "involved deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences." 38 C.F.R. § 3.1(n)(1). Evidence that the Veteran was speeding, lost control, went off the road, and struck a tree, combined with the evidence of at least some alcoholic consumption, provides sufficient evidence to create a reasonable finding of wantonness. See Sharp v. Egler, 658 F.2d 480 (7th Cir. 1981).

The appellant argues that the Veteran's death was not due to alcohol intoxication or any other "intentional" act, but rather was a result of an unfortunate accident. The Board disagrees.

The Court has held that failure to act wisely, without adequate findings or bases, is not sufficient for finding willful misconduct. See Smith v. Derwinski, 2 Vet. App. 241 (1992). In that case, a veteran died in a motorcycle accident where he struck a rock and incurred significant head and body injuries. At the time, the passenger indicated the motorcycle ride occurred at 2 in the morning after a night of drinking beer, and the Veteran drove the motorcycle at an excessive speed, without a helmet and recklessly doing wheelies. The accident occurred in Italy, in the middle of the night, with no eyewitnesses other than the passenger, who was severely injured in the accident. The Court found the Board did not provided adequate reasons and bases of specific findings of intentional acts that ultimately led to the Veteran's demise. Rather, the Court found too many unknown variables may have been relied on by the Board in issuing a denial of the claim. 

The Smith case is distinguishable from this case because in Smith the motorcycle accident in another country and there was very little evidence regarding the factors contributing to the accident. The Board concluded the Veteran acted with willful misconduct because he drove the motorcycle intoxicated, at an excessive speed, and without a helmet. The Court concluded the Board would need to provide further reasons and bases explaining how the evidence, to include investigative reports, autopsy, and eyewitness testimony, established that these intentional acts of the Veteran caused his death. The issue in dispute in that case was whether there was enough information to base a conclusive finding of willful misconduct. In this case, more facts are known about the accident. Two eyewitnesses described the events before the Veteran began driving, and the speed at which the Veteran drove. An investigator estimated the speed preceding the accident by measuring marks on the road.

In contrast, in Forshey v. West, 12 Vet. App. 71 (1998), the Court affirmed the Board's decision finding willful misconduct. The Court found that the Board met the standard of the manuals and regulations indicating that a finding of willful misconduct should not be based on "inconclusive evidence." Id., en banc affirmed, Forshey v. Principi, 284 F.3d 1335 (Fed. Cir. 2002). In that case, a veteran died from injuries sustained in a motorcycle accident when he hit a big boulder. At the time of the accident the weather was clear and the Veteran was not speeding. The investigative report concluded the motorcycle did not suffer any mechanical breakdown. Rather, the Veteran was found without a helmet and with a blood alcohol level of .139%. Based on those two intentional acts, which were conclusively reported, the Board determined that the Veteran's death was due to his own willful misconduct. The Court upheld the Board's decision, finding no clear error of fact or law. 

In this case, the Board has considered the appellant's main arguments. She notes that the Veteran was not legally intoxicated, and contends therefore that alcohol was not the reason for this accident. She further cites to Smith in her brief before the CAVC, claiming the Veteran merely acted "unwisely." The appellant's representative argues, in effect, that the evidence does not establish that but for the Veteran's intentional actions the death would not have occurred. Rather, the Veteran's intentional actions amount to "unwise" choices and not wanton disregard for probable consequences. The Board disagrees. Unlike the circumstances in Smith, the Veteran's MVA occurred after two eyewitnesses, following behind, observed some of the driving preceding the accident. Autopsy and investigative reports are consistent with the eyewitness accounts. Unlike in Smith, many important facts concerning the lead up to the accident and the accident itself are not in dispute.

The Board concedes that it is inconclusive whether alcohol played a key role in this accident. As explained above, however, the Board is not relying on alcohol involvement in concluding the Veteran's death was due to his own willful misconduct. Rather, the Board relies on credible and supported evidence showing that the Veteran made several deliberate and intentional acts of wrongdoing with wanton and reckless disregard of probable consequences, and that that wrongdoing caused the accident and his death. As indicated above, while it is unknown whether the Veteran continued arguing with his wife in the car while he was driving, it is undeniably clear that the Veteran sat behind the wheel and drove the vehicle after a heated argument with his wife over the questions of marital infidelity and divorce. Eyewitnesses who saw the Veteran's heated argument with his wife and who saw him subsequently get behind the wheel of the car undoubtedly establish that the Veteran drove in a heated emotional state. It is not in dispute that the Veteran was not wearing a safety belt. Also not in dispute is the fact that the Veteran drove at an excessive speed, over 80 miles per hour, and did not make any efforts to brake or slow down at the time he took a turn in the road.

The appellant's representative argues that there is no proof that if the Veteran did not make these choices, then he would have lived. For example, the appellant's representative indicates it is mere speculation to conclude that had the Veteran been wearing his seat belt he would have lived. Willful misconduct is found here, however, based on the totality of many intentional choices with wanton disregard of probable consequences that the Veteran made, causing his own death.

The Board concludes the Veteran's intentional acts of driving at excessive speeds, in an emotionally heated state, after consuming at least some alcohol, without a seat belt, showed intentional wrongdoing with wanton and reckless disregard of probable consequences. Similar to Forshey, there are specific known intentional acts taken by the Veteran that led to his death.

The appellant's representative also raises the argument that, according to the October 1996 Army Investigative Report, there was probable cause to believe that Veteran committed "negligent homicide," which according to the Uniform Code of Military Justice is a "lesser included offense of involuntary manslaughter." The underlying point of the appellant's argument is that the VA's finding of "willful misconduct," which requires a showing of "deliberate or intentional" acts, is subject to a different legal standard than the finding that the Veteran committed "negligent homicide," which merely requires a showing of "the absence of due care." See Appellant's 2008 Brief to the CAVC at 20-21.

The Board agrees that VA disability benefits, to include death benefits, are governed by VA regulations and statutes, and not criminal codes, local law or the Uniform Code of Military Justice. See 38 C.F.R. § 19.5 (2012) (indicating the Board is bound by applicable statutes, regulations of the Department of Veterans Affairs, and precedent opinions of the General Counsel of the Department of Veterans Affairs). Indeed, the Board is not permitted to "adopt" law contrary to Veteran's law. See Yeoman v. West, 140 F.3d 1443 (Fed. Cir. 1998). 

Accordingly, the definition of "willful misconduct" as described by VA regulations may very well reflect a standard in conflict with the Uniform Code of Military Justice, because the context in which the term is applied is vastly different. In this case, the Board is determining the appellant's entitlement to death benefits. The Board is not determining what, if any, crime the Veteran could be charged with under the Uniform Code of Military Justice. The Board thus does not consider the Army's consideration as to whether there was negligent homicide as evidence as to whether the Veteran engaged in willful misconduct.

As indicated above, VA regulations define willful misconduct as an act involving conscious wrongdoing or known prohibited action. "It involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences." 38 C.F.R. §3.1(n)(1). For reasons explained in detail above, the Board finds the Veteran committed several deliberate and intentional actions of wrongdoing with wanton and reckless disregard of the probable consequences. Specifically, the Veteran drove over 80 miles per hour, while in an emotionally heated state, after having consumed at least some alcohol, and with a passenger who had just been hitting him. There is no doubt that his decision to drive under the circumstances and the way he drove were deliberate, intentional acts because he knew the circumstances, and he was the driver of the car.

The Board finds that the Veteran's actions were reckless choices, and were the proximate cause of his death. Proximate cause is "[t]hat which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred." BLACK'S LAW DICTIONARY 1103 (5th ed. 1979); see Forshey, supra. Proximate cause is "[t]he dominant, moving or producing cause. The efficient cause; the one that necessarily sets the other causes in operation." BLACK'S at 1103. In this case, what can be deduced from the evidence is that the Veteran was likely impaired due to a combination of a heated emotional state and alcohol consumption. The evidence from eyewitnesses and the reports of the investigation of the accident convincingly show that the Veteran's reckless choices were the proximate cause of the MVA and his death.

The Board is sympathetic to the plight of the appellant and the Veteran's surviving daughter. Nonetheless, the Board must apply "the law as it exists, and cannot 'extend . . . benefits out of sympathy for a particular [claimant].' " See Owings v. Brown, 8 Vet. App. 17, 23 (1995), quoting Kelly v. Derwinski, 3 Vet. App. 171, 172 (1992). Unfortunately, the totality of the circumstances in this case clearly indicates that the Veteran was at fault in causing his own death through his willful misconduct. As the preponderance of the evidence shows that the Veteran's death resulted from his own willful misconduct, the cause of his death was not service connected. As he did not die from a service connected cause, his survivors, including the daughter for whom the appellant has appealed, are not entitled to DIC based on his death.


ORDER

The Veteran's death was the result of his own willful misconduct, and therefore the benefit sought on appeal is denied.



____________________________________________
MICHELLE L. KANE
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs